## Winstead et al. v. Commonwealth.

(Decided November 21, 1930.)

B. J. BETHURUM and R. BOONE BIRD for appellants.

J. W. CAMMACK, Attorney General, and GEO. H. MITCHELL, Assistant Attorney General, for appellee

OPINION OF THE COURT BY COMMISSIONER HOBSON— Reversing.

McKinley Winstead and George L. Pittman were indicted for the murder of William Kirby. On the trial of the case the jury returned this verdict: "We the jury find the defendants guilty and fix their punishment at two years each in the state prison." The court refused a new trial and entered judgment on the verdict. The defendants appeal.

The chief ground for reversal is that the verdict is palpably against the evidence. This requires a brief statement of the proof heard on the trial. McKinley Winstead married a daughter of George Pittman and was living with him. For some weeks they had been at a coal mine at work in Harlan county, but had returned home three or four days before the homicide and had been cutting up corn on Pittman's farm. Kirby had also married a daughter of Pittman. The commonwealth proved by Harrison Ramsey these facts: About 12 o'clock, on the day in question, he went to George Pittman's house and found William Kirby lying in the yard dead, about 25 feet from the house and 12 feet from the gate. He was lying on his right side with his right hand through his suspender. The other hand was down by his side. His pipe was lying between his left hand and his body. He was shot in the chest with a shotgun, also in the back with a shotgun, and one shot from a pistol struck him about 4 inches above the bend of the knee. The shot pretty well covered the left chest from the shoulder down and many of them were close together. They went straight in. His pistol was in the holster under his coat on the left side, some 4 or 5 inches from his hand. It was loaded and had not been fired. Some glancing shots struck his right hand, but his hand couldn't have been at the place where it was when the shooting took place. His hand had at least five shots in it. Ella Ramsey was 75 yards away. She heard nine shots fired. One from a shotgun, then four from a pistol, then

another from a shotgun, and others from a pistol. She could see the walk from where she was, but could not see the house, as a building was between; she did not see Kirby. She saw smoke from the shots coming from the house, and about four minutes after the shooting saw the defendants leave the house. George Pittman was carrying a shotgun. They went up the road toward Mt. Vernon. There was a cedar tree and rose bush near the gate. She could not see the gate. If Kirby had been standing where his body was found after the shooting, she could have seen him; but she did not see him at all. Charles Kirby counted the shot. There were 106 shot in his back and 240 in his chest. He testified that he was shot twice in the chest with a shotgun, from the fact that the shot on the right were not from the same load as the shot on the left. Bill Bullock and Lester Kirby testified in substance to the same facts as to the wounds. Florence Clounts, who kept a store about three-fourths of a mile from George Pittman's house, said they came to her store a few minutes after the shooting, and when they came up she said: "Lord have mercy, George, what is the matter?" And he said Kirby was killed and she said, "Did you do it?" and he said: "We both shot, we had to, he was coming in on us." George Renner and Annie Renner testified that after the killing George Pittman said: "We were closer together than people thought we were. Right here is where I was standing and here is where Bill was standing at the time they commenced shooting," and he walked up and spoke, and right here is where he fell. Bill Ramsey testified that Pittman said he saw him coming, "laughing a dry laugh, half laughing, and he was closer than anybody had any idea; every time he shot he saw the dust fly." Nath Doan and Tom Kirby testify to the same facts as to the wounds. The latter stated that there were two shot in the pistol holster and there were bullet marks on a post and on a crate just beyond the body of Kirby. There was also some proof of threats made by Pittman against Kirby before the homicide.

On the other hand, the defendants proved by themselves, by Mrs. George Pittman, Mrs. McKinley Winstead, Rosa Russell, and Clyde Pittman, in substance, these facts: They were eating dinner about 11:30 a. m. at George Pittman's house. William Kirby drove up in the road in front of the house with four mules, and hol-

lered "whoa" very loud; then hollered for McKinley Winstead. Rosa Russell stepped to the porch and he said, "Tell McKinley Winstead I want him out here." She said: "He ain't coming, he is eating dinner, you go on. Don't stop here and have no trouble." She went back in the house and Mrs. Pittman went to the door. He said: "Are you McKinley Winstead? Where is McKinley Winstead? Is he sick and in bed? He is the man I want out here." She said: "Bill, go on, don't stop here, have no trouble, he ain't coming out." He said, "I am coming in after him." When he said that, Winstead walked to the door, and he was coming in the yard; was halfway between the gate and the house. He was as pale as could be and shaking all over. As Winstead went out he picked up his gun that was standing in the corner. Mrs. Pittman met him and said: "Bill, please don't come in here, we don't want to have any trouble." He said, "Don't stick your old face out here." George Pittman came to the door and said: "Bill, go on home, don't start no trouble here." He said: "Dry up your mouth, you S. B." He then said: "McKinley Winstead you wrote me that there was a new trade made for the dog. I have been run over long enough by you fellows." He was bent over and jerked his coat back and went for his gun, and then the shooting commenced.

In rebuttal the commonwealth proved, after laying the proper foundation, that Clyde Pittman made this statement at the inquest held the evening the shooting occurred: "Bill Kirby came down in the yard and hunkered down smoking, and asked where McKinley Winstead was. McKinley and George Pittman came to the door and commenced shooting and I ran." He made a similar statement to persons that afternoon before the inquest was held. Clyde Pittman was a son of George Pittman and was in the house at the time. The defendants say they left home after the shooting, leaving Kirby lying in the yard because they were afraid the Kirbys would do them violence. They went to a neighbor's, and later went to the county seat and executed bond for their appearance. They also proved threats by Kirby against them and testified that they shot in good faith, believing that they were then and there in danger of being shot by Kirby. Pittman shot the pistol; Winstead used the shotgun. There had been some bad feeling in the family, and the defendants testified that to get away from it they had gone up to the coal mine and worked for some weeks.

The defendants introduced May Kirby, and offered to prove by her these facts: "William Kirby said if they ever came back to the county he was going to kill them if he ever saw them. They had to keep out of his way or he would kill them. He made these statements a day or two after they came back from Harlan county and also at another time said that he was going around to George Pittman's house and go in there and get them if they didn't come out. He said he was going down there the next day. This was the day before he got killed." The court refused to allow the witness to testify because the witnesses had been placed under rule and May Kirby had been in the courtroom when Annie Renner, George Renner, and Belle Ramsey testified for the commonwealth. These witnesses testified only as to what George Pittman had said. They had not testified to any statement made by William Kirby. The witness had heard no part of the testimony for the defendants, and while she had disobeyed the rule, under all the facts the court erred in refusing to allow her to testify. The evidence was very important for the defendant, for the position of the commonwealth was that there was no trouble between the parties at this time. Robertson's Criminal Law, sec. 1936; Music v. Com., 186 Ky. 45, 216 S. W. 116; Render v. Com., 206 Ky. 1, 266 S. W. 914.

The commonwealth attorney in his final argument to the jury said this:

"The defendants introduced Noah Tipton, the deputy sheriff, and proved by him that a peace warrant was sworn out by the defendant, George Pittman, against the deceased, Bill Kirby. Tipton swore that he received this writ and went to the deceased and his father and appealed to them to drop this trouble and let the warrant be filed. Kirby agreed and then Tipton went to the defendant, George Pittman, and he agreed for the peace warrant to be filed and for them all to be friends. Pittman told Kirby's father to say to the deceased for him that he was welcome to come to his, Pittman's house, and that he would be welcome at any time to come. There is no evidence in this case to show that Kirby was not at all times after that up to the time of his death, perfectly friendly with the defendant, Pittman, and who knows but what at the time he was killed he was paying a friendly call upon the invitation of the defendant, Pittman."

If the testimony of May Kirby had been admitted, the last sentence, above quoted, could not have been used. When Tipton was on the stand and had stated that Pittman agreed for the warrant to be dropped, Pittman proposed to prove by Tipton that when he put the proposition to Pittman, Pittman said, "Yes, with that understanding I consent to it, as peace is what I want." The court should have allowed the witness to testify to what Pittman said at the time the agreement was made.

The threats proven to have been made by Pittman, and what he said not in the presence of Winstead, were competent against Pittman, but were not competent as evidence against Winstead, and the court should so have charged the jury when the objection was made to the testimony. Mrs. Pittman could not testify for her husband, and Mrs. Winstead could not testify for her husband; but each could properly testify for the other defendant in the case, and the court properly so charged the jury. Lawson v. Com., 169 Ky. 180, 109 S. W. 587, L. R. A. 1915D, 972. As the judgment must be reversed for the reasons above given, the court does not now pass on the question of the sufficiency of the evidence to support the verdict. The verdict is to be read in connection with the instructions of the court under which it was rendered, and when so read it is apparent that the jury meant to find the defendants guilty of manslaughter and fix their punishment at two years' imprisonment. Such verdicts have often been upheld. Hall v. Commonwealth, 207 Ky. 718, 270 S. W. 5. The judgment of the court rendered upon the verdict is not in the proper form, but it is not a nullity. The judgment should follow form No. 288, given in Carroll's Code on page 1077. Other matters complained of may not occur on another trial.

Judgment reversed, and cause remanded for a new trial.